## W. R. GRACE & CO. v. CHARLESTON LIGHTERAGE & TRANSFER CO. et al.

## WEIL et al. v. CHARLESTON LIGHTERAGE & TRANSFER CO. et al.

### Nos. 1050, 1051.

United States District Court, E. D. South Carolina. Charleston D.

June 26, 1951.

See also D.C., 95 F.Supp. 249.

Waring & Brockinton, Charleston, Atkins & Weymar, New York City, for petitioner.

Mitchell & Horlbeck, Hagood, Rivers & Young, all of Charleston, for respondent.

WARING, Chief Judge.

On the morning of October 22, 1949, the Steamship Santa Isabel arrived in the port of Charleston. She was laden with a cargo consisting in large part of bananas but also with a considerable number of bales of Peruvian cotton. This last named is a long staple cotton and for the sake of cargo economy the bales are very tightly compressed. A quantity of this cotton cargo was consigned to and owned by the Libellants, W. R. Grace and Company, a corporation and Adolph Weil, Lionel Weil, Adolph Weil, Jr., Lucien S. Loeb, James L. Loeb, Alvin B. Weil, Emil Weil and Robert S. Weil co-partners doing business under the firm name and style of Weil Brothers.

For some time, similar shipments had been coming to Charleston at comparatively regular periods of approximately one week's interval. It was requisite that these imported cotton shipments be subjected to fumigation treatments and it was the regular practice to have such cargoes transported by barge or lighter from the docking place of the steamship to the fumigation plant of the South Carolina State Ports Authority which is situate in the area commonly known as North Charleston. The most convenient and economical method of getting this cotton from ship to fumigation plant is for the bales of cotton to be unloaded directly from the hatches of the ship upon decked over barges known as lighters which are towed up the Cooper River in a northwardly direction to the fumigation plant, the distance being approximately nine miles. After the fumigation is completed, the cotton is then in condition to be shipped by rail, truck or water or any other method from the State Ports Authority which has all of these terminal facilities.

The agents for the shipping line had made arrangements for these transfers. Charleston Lighterage and Transfer Company which is a corporation was engaged in the business of transporting cargoes of this and other types for hire. It was not a common carrier but a private transfer line. It owned a towboat named "Josephine" and furnished towage facilities and, at times,

obtained by lease lighters or barges and transported cargoes or materials. This Lighterage company engaged to take cotton cargoes from this line of ships, whenever they arrived, to the fumigation plant as above described. It appears, however, that the Lighterage company had a hard and fast agreement with the Merritt Dredging Company to give to the last named priority for the use of the "Josephine" and that in making these engagements for the transportation of cotton, the officers of the Lighterage company specified that Merritt should have a priority in case of conflict.

Shortly prior to the arrival of the Santa Isabel, agent of the shipping company and of the cargo owners advised the Lighterage Company of the expected arrival of the vessel with information as to the amount of cotton cargo which would have to be lightered to the fumigation plant. It happened that just at that time, the "Josephine" was engaged on some work for the Merritt company and, due to the priority arrangement above described, Miss Sarah B. Silcox, the President and chief owner of Lighterage company conferred with the shipping agents and explained the exigencies occasioned by this priority and stated that there might be difficulty and almost certainly delay in getting the "Josephine" back into the port of Charleston in time for the proposed operation. As a result of these conferences and primarily through the good offices of Mr. Thaddeus Street, Jr., who is an officer in Street Brothers and in Carolina Shipping Company and in Charleston Stevedoring Company, all organizations connected or concerned with taking various parts in and facilitating the operations of the ship and cargo under consideration, it was arranged that another tug or towboat would be made available to tow the lighters. Mr. Street communicated with Mr. Burnett, manager of the White Stack Towing Corporation, a corporation which owns and operates tugs and towboats in and around the port of Charleston. This company owns several tugs, among others one named "Fort Sumter". It appears that the usual rate for towage charged by White Stack Towing Corporation was $25 per hour

whereas Lighterage company was performing this operation at a much cheaper rate, namely, $15 per hour. This presented a difficulty, but Mr. Street persuaded the manager of White Stack to accept this particular tow on that day at the same rate charged by Lighterage company. It appears that this was brought about by reason of the fact that there are intimate and reciprocal business relations between the various shipping and water front interests represented by Mr. Street and the White Stack company. In other words, the last named company agreed at this time, because of its business relations with ships and shipping represented by Street to accept this towing job and receive from Lighterage company just what the latter would charge and get, had the "Josephine" been available.

Charleston Lighterage being advised of the amount of cotton to be received and transported arranged to have available two lighters. The larger one was leased from an owner not in any way concerned or a party to this cause and will be merely referred to as the "large lighter" in description and consideration of the events involved in this suit. The second lighter which will hereinafter be referred to as the "small lighter" and is the "one lighter" a defendant, involved in this suit, was leased from Charleston Constructors, Inc., a corporation.

It appears that a number of years ago (about 1946) this company (hereinafter called Constructors) purchased this lighter. Constructors is a corporation engaged in varied building and constructing operations and does a fair amount of business in marine or semi-marine construction. And so it was deemed advisable for it to have for its own use a lighter for transporting materials, machinery and workmen, useful and to be used in operations along wharves, piers or other water front work. But this company did not have constant or continuous use for the lighter and so it was frequently made available to be leased to Lighterage company or others if and when its owner did not itself have it in actual use. On the day in question, October 22, 1949, this lighter was leased by Charleston Lighterage at a rental of $15 per day.

It appears that at the time the lighter was purchased, it was hauled up and certain repairs made to it. The lighter was an ordinarily constructed wooden barge with its bottom sheathed, the sheathing coming up about four feet on each side. Each end of the lighter was constructed on a slant so as to have overhangs such being commonly known as "rakes". The lighter was a decked over barge with small hatches for use in going below. No cargo was stored in the hold and these openings were merely in the nature of manholes for access to the interior for repairs, inspection and, of course, for pumping out of bilge water. The deck was of ordinary planking and not caulked or made water-proof and there were no covers nor combings on or around the hatches. In other words, this craft was a barge of the type commonly known as a lighter to be used solely for deck loads: and by reason of its large and unused interior it had a high degree of buoyancy. The lighter was approximately 80 feet long by 30 feet beam and 7 feet from bottom to deck.

On the day in question, under orders from Miss Silcox, one Sylvester Reynolds, a water front worker intermittently employed by Lighterage company, was directed by Miss Silcox as her employee (he was not in any way connected with Constructors that day although he frequently worked for it) to look over this lighter, particularly with a view to whether it had any excess water in the hold and to have it ready and available for use later in the day. Reynolds did this. And he testified that the lighter, then floating on an even keel, appeared to be sound and seaworthy. He saw no breaks or openings anywhere when he looked from inside the hold all around with a flashlight. He sounded for the bilge water and found four inches of water which was a rather negligible amount. With assistance and by hand, this lighter was warped around and made available for a towboat to place it alongside the Santa Isabel somewhat later in the day. This and the larger lighter were both placed alongside the vessel at convenient

locations relative to the hatches from which the cotton would be hoisted and put upon the lighters. The two lighters were tied together. The cotton cargo was taken out of the hold of the vessel by the stevedoring company and piled or stacked upon the two lighters. Many of the bales were lashed together and they appear to have been placed upon and securely fastened on the lighters. All parties agree that the smaller lighter was loaded somewhat more heavily at one end than at the other. And it is also agreed that this is common practice since in operations of this character, it is preferable that one end of the lighter be somewhat higher out of the water than the other as that facilitates and makes safer towing operations. This common and accepted practice is based upon the reasoning that, in towing a lighter loaded as this one was, it is better to have the forward end of the tow somewhat lighter so as to avoid the possibility of danger of this forward end taking on water or being submerged or at least lowered to a danger point. All parties agree that this lighter was loaded in conformity with that practice. The estimates as to the difference in elevation of the two ends vary. It is not greatly material, however, since no exception or criticism was filed to the method of loading. It must be remembered that upon the completion of the loading, the Lighterage company accepted the loaded lighter in the condition in which it was and receipted for it. And the captain of the towboat, hereinafter referred to, when he came up alongside saw the condition of the loaded lighter and accepted it without demur. And so all parties respondent here are in no position to make any complaint in regard to the method of loading and storage of the cotton on the lighter and as a matter of fact, they do not.

Approximately four o'clock in the afternoon, the "Josephine" not having arrived, White Stack ordered its tug, "Fort Sumter", from its mooring place at Adgers Wharf (which is some distance south of where the Santa Isabel was lying) to proceed up the river and take these two barges to the fumigation plant as heretofore agreed upon. The "Fort Sumter" is a tug of approximately 149 tonnage and 900 horsepower with Diesel engines. Its crew consisted of John J. Jackson, master, and two deckhands, James Jackson and Russell Mitchum. It had an engineer named Leo Sanchez. The first three appeared as witnesses in this cause but the engineer was not available and representatives of the company stated at the hearing that arrangements had been made to have him available as a witness but they had received a telegram just before the trial that due to shipping engagements, he could not come. It is in evidence that after the two lighters were loaded, they were pulled from alongside the cargo vessel around to the head of the pier known as the Seaboard wharf where they were lying ready for a tug to pick them up.

There is a serious conflict in the testimony at this point as to the arrangement of these lighters. Two witnesses called respectively on behalf of Libellants and of Constructors testified positively that the end of the small lighter which was lower in the water (due to the method of loading above referred to) was next to the large lighter and the two were there lashed together. The witnesses who were members of the crew of the tugboat positively contradicted this and state that the lower end of the lighter was pointing to the southward and the higher end of this lighter was against and lashed to the large lighter.

The "Fort Sumter" came upstream on a flood tide. And according to custom and good nautical practice, came about, making a complete turn in the channel, so as to approach the barges against the tide. According to Captain Jackson and the crew of the "Fort Sumter" they came alongside the larger lighter, made fast to it and then slowly eased out into the stream. Captain Jackson described this as not really pulling a tow but "nudging" the tow out. He said this was done because the lower end of the small lighter would be pointing forward when the tow was turned and that would not be good practice, and so he determined that the lighters would be rearranged. An additional reason was that he did not wish to have two heavily loaded lighters, one behind the other on the same side of his

tug when it would be safer and much better practice to take one on each side. Accordingly, he says, he pushed these lighters a little upstream so as to get beyond the piers of the Todd Shipyards plan which jutted out into the river. And there, in more open water, and in a more convenient location, he rearranged the tow. He had taken both of these lighters on the starboard side of his tug. He kept the large lighter lashed to his starboard but swung the small lighter around his bow and lashed it with two lines on his port side; the higher end of the small lighter being forward and the lower end aft. According to Captain Jackson, he took these lighters from the wharf at approximately 4:15 P.M. and then after performing the above described operation, proceeded upstream in a northwardly direction and with the tide, intending to take these lighters up to the fumigation plant in accordance with directions. This description is corroborated by the two deck hands. According to the testimony of these members of the crew, everything was proceeding satisfactorily for a while and then one of the deck hands noticed that the lower end of the small lighter appeared to be unduly low in the water, and he gave an alarm and Captain Jackson slowed his engines, came out on deck and having corroborated this fact stopped his engines. By that time, the forward line from the tug to the lighter came loose as a result of the bitt on the lighter to which it was fastened breaking off. Apparently feeling that the lighter would swing around and collide with the stern of the tug, the deckhand near the stern ease out the stern line and eventually it, too, came loose by reason of a second bitt on the lighter breaking away. The lighter was thus released and was sinking steadily at one end and some of the bales of cotton fell off into the water and floated in various directions and after a lapse of time, the lighter settled into the water until her decks were awash. The "Fort Sumter" by means of radio-telephone, communicated with White Stack offices and the last named sent another one of its tugs, the "Cecilia" upstream with pumping apparatus and with orders to give aid. The "Cecilia" turned over the pumping apparatus to the "Fort Sumter" and relieved the last named of the large lighter and took that in tow up to the fumigation plant where it was berthed safely and so far as it was concerned, it disappeared from this case.

It was now getting dark. The "Fort Sumter" had aided in beaching the sunken lighter on the eastern shore of the river and stood by during the night. In the meantime, the tug "Josephine" had arrived in port and getting notice of the disaster, proceeded to where the "Fort Sumter" and lighter were located. But night had about fallen and it was impossible to then do more. The next morning, the "Josephine" came back to the scene and all parties seem to have worked together to remedy and alleviate the damages. The lighter was pumped out sufficiently to again float it and it was towed to the fumigation plant with what cotton remained on its decks; and in addition, a number of bales of cotton which had been recovered from the vicinity were attached and towed along with the lighter. And so what remained of the cargo, most of it quite wet with salt water, was landed at the fumigation plant. Various bales were picked up from different parts of the vicinity but 24 bales were not located until a day after. These last had floated down stream and across the harbor and were located on the beach at Sullivan's Island. They were there rescued and placed on trucks and taken up to the fumigation plant. They had been in the water for something over 48 hours.

The foregoing part of the story of the occurrences leading up to the time of the loading of the lighters is in substance agreed to by the parties in interest. However, commencing with the placing of the lighters and their being picked up by the towboat, there are strong contradictions. The members of the crew of the tug, consisting of Captain Jackson and the two deckhands are in agreement as to the facts as detailed above. The other witnesses give contradictory versions of how the lighters were placed and how they were towed. The witness, Reynolds, above referred to, states positively that the lower end of the small lighter was up against the

large lighter, and he says that when the towboat started up the river with the lighters, these were both alongside the tug and one lighter was still behind the other and that the lower end of the small lighter was was headed upstream. It is true he did not stay within eyesight until the tow had gone any very great distance. But he says it was moving in that way and rather fast when he last saw it and that his job being over, he knocked off and went away. In part this testimony is flatly contradictory of that by the crew of the tug. But the fact that he did see the two lighters start up the river that way is not entirely contradictory because Captain Jackson testified that he went a little above the wharf from which he started in order to get north of the Todd Shipyard plant and get a wider and clearer place in which to maneuver the lighters. It may be that Reynolds saw the tow go only that far. However, he insists that the lower end of the small lighter was upstream.

George Carlton who has worked on and is familiar with towboats, lighters and marine work testified that he had seen the lighters when loaded and before the tug came up and he corroborated Reynolds as to the lower end of the small lighter. However, he did not see the tug take them or any of the other maneuvers. Isaac Washington who is a watchman on a nearby wharf says that when the tug and the two lighters passed his place, they were going at a considerable speed and created enough of a wake or wave to make the boats moored to that wharf "jump up". He refused, however, to make an estimate of the speed.

It is strange that there are no other eyewitnesses to the progress of the tow and the submerging of the lighter. Considerable testimony was introduced as to the distances traveled by the tug and its speed and the probable speed of the flooding tide. And while many deductions were attempted to be drawn therefrom, no satisfactory answer can be given to the speed at which the tow was proceeding. The tugboat witnesses are positive that the "Fort Sumter" left its moorings at Adger's Wharf at 4:00 and that it was 4:15 when it picked up the tow. There are sharp contradictions as to time based upon telephone conversations between Miss Silcox and Mr. Burnett. But I do not think that any of these things prove very much. The tug, to corroborate the testimony of its crew, has furnished its log books. The deck log kept by the master is in accord with the times given in his testimony. The engine-room log is verbatim. It is urged upon me that the fact that these two logs give not only the same data but in the same language indicates that they are not true contemporaneous records. Other counsel have pointed out that there are numerous other instances in the two log books where the same verbatim account occurs of matters of daily routine and regarding which there are no disputes or law suits. I find these arguments rather beside the point. The logs are apparently very badly kept and it is not hard to realize that the engine room log was at times sadly neglected and probably, in many parts, represents copying from the deck log in a belated attempt to comply with rules and regulations.

As always, in a conflict of testimony, it is difficult to determine where the truth lies. Some of the testimony above referred to and some of the other circumstances tend to contradict and discredit the testimony of the tugboat crew. On the other hand, there is no one who contradicts their story as to the rearrangement of the lighters. And in order to discard the positive, clear and direct testimony of the only three eyewitnesses to the sinking and facts immediately leading up to the sinking of the lighter must require strong proof. In addition to this, the Libellants being the actors in this case are called upon to produce proof of the negligence or wrongdoing by the tug. I do not think they have sustained this burden and feel that I am constrained to accept the version of the actual sinking as given by the crew of the tug "Fort Sumter".

As to why this lighter should have become submerged and gone under water is not easy to explain. The weather was clear, the water calm, and a very light wind was blowing. There was no sudden emergency caused by a rain or wind squall or

any unusual circumstances. There was no evidence of waves or wash caused by passing craft. And so far as the evidence shows, this lighter started to sink without warning or apparent reason. An inspection of the lighter on Sunday, October 23, the day after the sinking, disclosed that there was an opening between two of the planks on the rake at one end of the lighter. These rakes were made of long planks put transversely. The edges of the planks were beveled and were caulked from the outside. As heretofore stated, there was sheathing underneath and this came up a distance of four feet along the sides and the rakes. This opening (or crack or hole as some called it) was above the sheathing and the testimony was that it was about four feet above the water line. Many witnesses testified that the lighter could not have been that deep in the water even when it was unevenly loaded as it was on the occasion of this sinking. It was the theory of those who attempted to charge the tug with fault that the lighter was being towed with the low end upstream and forward and that this was probably the end with the crack in it if the crack was there at the time, and that water either came in through that or over the deck. But there is much testimony to contradict all of that theory. And, as a matter of fact, the owners and lessors of the lighter deny that this opening was there before the sinking. They say that the lighter was inspected from the outside and this opening did not show. And they claim that it was probably caused by the fact that when the lighter was submerged, its interior became, of course, full of water and after it was beached and tide fell, the pressure of the water inside probably broke the caulking between the planks. The opening was from two or four inches wide and about four feet across. As to whether this was where the water came in is a matter of speculation. Witnesses who examined it after the occurrence said that not only was this opening there but that the edges of the planks on the opening showed rot or as one witness expressed it, "the edges were soft". There was also evidence that the ends of the bitts that had broken off at the time of the sinking showed signs of rot. These evidences of the unfitness or unworthiness of the lighter were strongly pressed by the representatives of the tug as being the real reason for the sinking. A contra-argument on behalf of the lighter was made by showing that this same lighter without any repairs being made on it was used one week later for a similar conveyance of cotton between the same points. It was shown that on October 29, this lighter was towed by the "Josephine" and delivered a similar shipment of cotton without misadventure. However, it was in evidence that on this second trip, the cotton cargo was not as large or heavy. And no one testified as to whether the end without the hole in it was made higher or lower by the load nor was there any testimony as to which end was placed forward in the passage of the lighter through the water.

There is no question that under ordinary circumstances of weather, wind and tide, a lighter containing cargo owned by the Libellants sunk and the cotton cargo was severely damaged. There were no unusual circumstances that would create an act of God or unavoidable circumstance or mischance. Someone must have been at fault. I do not find any positive evidence of fault by the tug and I do find considerable evidence that the lighter on which the cotton was placed was in very poor, even in bad condition. It is true that some witnesses testified that they considered the lighter "seaworthy" adding that such opinion was based on the character of the work which it was called upon to do. Now this leaves a margin of speculation. It probably was seaworthy for the purpose to which the Constructors used it for hauling materials, tools, etc. It probably was seaworthy from time to time when used for transporting cargo. But this day, with a very heavy load of cargo upon it, it failed and sank. The evidence of inspection and care was rather superficial. Nothing apparently had been done for the upkeep of the lighter; and there is no evidence of any inspection at any time since 1946 excepting the casual looking at it from the outside or occasionally looking at it inside with a flashlight and then mainly for the purpose of ascertain-

ing whether any amount of water had collected in the hold.

■ The Lighterage company furnished this lighter under contract with the owners of the cargo and it was that company's bounden duty to furnish a sound and seaworthy lighter to convey the cargo. The contract was between the cargo owners and the Lighterage company and the latter must and should be responsible for any damage or loss. Even if the tug should be found to be at fault, this would be only secondary since the Lighterage company engaged and furnished the tug. If I were convinced that the tug was at fault, I would have to find judgment against the Lighterage company primarily with leave for entry of judgment over against the tug for reimbursement. But since I do not find satisfactory evidence of mismanagement or negligence by the tug, I am convinced that the judgment should be against Lighterage company and not against the tug and White Stack, its owner.

White Stack has attempted to set up an additional defense. It offered to prove that it was exempted from responsibility by reason of the fact that it had heretofore publicly made declarations that it would not be responsible for any damages which resulted from towing operations. I did not allow these declarations in evidence because I do not seriously consider them as defenses. If the owner of the tug was responsible at all, it was because of negligence and he cannot contract against his own negligence and moreover there was not a shred of testimony showing that the Libellants or Lighterage had any knowledge or information relative to these declarations by the White Stack Company. The court was asked to assume that because White Stack had some printed matter giving information in regard to its services and stating that it accepted no responsibility for damages caused by towing accidents that these other parties were, in some way, bound by such declarations. There was no testimony showing any contractual obligations embodying such an agreement or exemption nor was there any testimony that any of the other parties in interest had any knowledge of these self-serving declarations by the tug boat company. In view of my finding White Stack free from negligence, it is unnecessary to pursue this inquiry further.

We next come to another phase of the case. The lighter was actually owned by Charleston Constructors, Inc., and the Libellants take the position that they are entitled to a judgment in personam against Constructors and also a judgment in rem against the Lighter as well as the one in personam against Lighterage company. Having found that they are entitled to a judgment against Lighterage company, it follows that they are entitled to an in rem judgment against the Lighter itself. But this, by no means, carries the argument further.

■ There was no privity of contract between the Libellants and Constructors. They do not know each other at all. Constructors had no knowledge of the use to which the lighter would be put nor any control over it when it was turned over and leased to Lighterage company. They made no warranty or guaranty of seaworthiness for all purposes. They used it themselves for very limited work. And they were lessors only, without any knowledge or control of the exact use or method of operation which Lighterage company would make of this lighter. I think that the evidence shows conclusively that they had no control of the situation, that they were not guilty of any negligence or knowledge of unseaworthiness of the lighter nor am I able to find that it was unseaworthy for the normal ordinary purposes for which they owned it. Now if they had been the owners and had chartered this for a particular voyage or use, the doctrine so frequently announced in many decided cases of the owner being responsible for seaworthiness would have applied. But it must be remembered that they did not charter this lighter for the purpose for which it was used and it must also be remembered that there was no contract between libellants, the owners of the cargo, and the actual owners of the lighter, namely Constructors. Constructors turned the lighter over to Lighterage for any use the latter might be disposed to make of it. Lighter-

age customarily used its own towboat but on this day, due to extraordinary circumstances, engaged White Stack to furnish a towboat. The Libellants did not know what towboat was to be used and they did not know who was the actual owner of the lighter. Their business and contracts were entirely with Lighterage and so Lighterage in this case is in the position of an owner just as if it had good title to the lighter. The distinction between the actual owner of a vessel and the charterer or person in temporary possession is clearly recognized in the Admiralty courts.

■ In Reed v. U. S., 11 Wall. 591, 78 U.S. 591, at page 601, 20 L.Ed. 220, the Court says: "Courts of justice are not inclined to regard the contract as a demise of the ship if the end in view can conveniently be accomplished without the transfer of the vessel to the charterer, but where the vessel herself is demised or let to hire, and the general owner parts with the possession, command, and navigation of the ship, the hirer becomes the owner during the term of contract."

In Leary v. U. S., 14 Wall. 607, 81 U.S. 607, at page 610, 20 L.Ed. 756, the Court says: "There is no doubt that under some forms of a charter-party the charterer becomes the owner of the vessel chartered for the voyage or service stipulated, and consequently becomes subject to the duties and responsibilities of ownership."

In Vitozi v. Balboa, Shipping Co., 1 Cir., 163 F.2d 286 at page 289, the Court says:

"In a charter of this kind in which the owner surrenders entire control and possession of the vessel and consequent control over its navigation to the charterer, the latter becomes what is called the owner pro hac vice. That is to say, 'without any sale or purchase of the ship' the charterer becomes its owner for the term of the charter 'with the character or legal responsibility of ownership.' Reed v. United States, 11 Wall. 591, 600, 601, 78 U.S. 591, 600, 601, 20 L.Ed. 220. Differently expressed the charterer under a demise charter party becomes the 'owner of the vessel chartered for the voyage or service stipulated, and consequently becomes subject to the duties and responsibilities of ownership.' Leary v. United States, 14 Wall. 607, 610, 81 U.S. 607, 610, 20 L.Ed. 756. See also United States v. Shea, 152 U.S. 178, 14 S.Ct. .519, 38 L.Ed. 403.

"Certainly if under federal law a demise charter party casts the duties and responsibilities of ownership upon the charterer, under federal law it must cast upon him the duty and responsibility to see to it that the vessel is seaworthy during the term of the charter, *even though it may not have been seaworthy at the time when the charter party was entered into*. On this reasoning two courts in cases in point have held the shipowner not liable. In re New York Dock Co., 2 Cir., 61 F.2d 777; Muscelli v. Frederick Starr Contracting Co., 296 N.Y. 330, 73 N.E.2d 536. We consider these cases correctly decided." (Emphasis added.)

■ I am of the opinion that Constructors is in no sense responsible for the disaster caused by the lighter sinking and that not only is it not responsible, in personam but that it is entitled to plead, as it has, limitation of its liability to the value of the lighter and in addition the earned freight. See Title 46 U.S.C.A. § 183. It has met this condition by pleading the statute and making no attempt to recover the lighter which was attached for the benefit of the Libellants. It not only abandoned further claim to the lighter but paid into this court the earned freight amounting to $15.00. I feel that I am constrained to discharge Charleston Constructors, Inc. from any further responsibility or liability in this case.

■ Under the Admiralty practice and particularly under Title 46 U.S.C.A. § 183 et seq. an owner may limit his liability to the value of his vessel and the freight then pending provided, of course, the damages claimed are occasioned or incurred without his privity or knowledge. But this does not relieve the owner from his responsibility of furnishing a seaworthy vessel. And while Section 186 of this Title provides that a charterer may be deemed the owner of the vessel, nevertheless, in view of my finding that there was negligence on

the part of Lighterage and that there was a duty upon such company to furnish a seaworthy lighter for the purpose to which this lighter was put and it failed so to do, Lighterage is not entitled to the benefit of the Limitation of Liability Statutes although Constructors may so benefit.

And so I conclude that Libellants are entitled to recover from Charleston Lighterage and the lighter itself the amount of loss suffered as a result of the sinking of the lighter on October 22, 1949 hereinabove described. And I have concluded that the parties respondent other than the Lighterage Company and the lighter itself and the freight money paid into the Court must be discharged.

But another and perplexing question arises as to the measure of damages. The parties have stipulated the market value of the cotton and the amount of the damaged cotton and the prices for which it was sold. And so the Libellants claim that this difference is the amount due them plus, of course, costs of salvage and reconditioning. But the Respondents deny this and claim that the loss is, in great part, augmented by the negligence of Libellants in failing to act promptly in salvage operations. This question is quite difficult to solve. There is no doubt about it that cotton is peculiarly susceptible to salt water. And it is in evidence and admitted that tightly compressed bales such as the ones in this case will absorb more water than loosely compressed cotton. At first hand, this would seem strange but the fact is that large air spaces in loosely packed cotton prevent the entrance of water, but where cotton fibers are closely compressed air is expelled and the fibers are in better condition to absorb moisture. These bales of cotton were tightly compressed and apparently they absorbed a great deal of salt water. Now some of the bales were submerged for a short time, particularly those that stayed on the lighter. But others were in the water floating around for many hours and some of them were collected and fastened to the lighter by lines and were actually towed through the water up to the fumigation plant. They certainly had ample opportunity to become saturated. And still more,

that is to say 24 bales, floated around and across the harbor and were recovered on the beach at Sullivan's Island. And they seem to have been in the water approximately two days and nights.

■ It was required that this cotton be fumigated before anything was done to it. And so all of it had to go to the fumigation plant. There seems to have been some little time spent in communicating with the owners. This delay was accentuated by the fact that the sinking occurred Saturday afternoon. Monday morning, when everyone was advised of what had been happening, agents here got busy but still the fumigation was not immediately commenced and it was in testimony that representatives of the owners and insurance carriers inspected the cotton. They had the Sullivan's Island bales brought in and then after the fumigation, the cotton was placed on railroad cars and brought down to the City Compress Company for reconditioning. There was abundant testimony that a cotton bale, when wet, should be promptly torn open and exposed to the air for drying purposes and if this is not done quickly, the moisture continues to work through the fiber and goes further and further in with greater damage progressively. Of course, I realize that we cannot have immediate and perfect salvage operations. These things necessarily take time. Authority must be obtained from the owners and others interested and the proper place and plant must be found to do this work. There was testimony that there were only two places at which this work is done in the port of Charleston and one, the Oakdene Compress Company declined to take the job but the City Compress and Warehouse Company did. Four or five days delay would have been reasonable considering that some of the cotton was still in the water for two days and had to be gathered; fumigation had to be perfected although this takes only a few hours, and the bales of cotton had to be identified and transported to the Compress Company. But the Compress Company did not receive this cotton until November 2. And so we have over ten days between the sinking and the salvage operations. I think this

an unreasonably long delay and I feel that the owners of the cargo did not perform as diligently as they might and should have.

Again we come to a difficult question and one even more difficult, namely, what percentage is a fair amount to be deducted because of this lack of diligence. One witness testified that if the opening of the bales had been done promptly, the time loss would have been only one-third of what it was eventually. But that was merely an estimate and was based upon the idea that the salvage operations could have been immediately done after the recovery from the water. I realize such promptitude to be an impossibility. And with very little factual information or expert testimony on which to base this finding, I am constrained to use an estimate considering all possible factors involved. I believe that several days were necessarily lost in communication between the various parties and refusal to accept responsibility and act promptly. I would say that such dilatoriousness must be penalized to a certain extent and shall reduce the amount awarded for the loss in market price by 10%.

Of the bales owned by Grace, the net weight was 50,381 lbs. After reconditioning, there remained good cotton to the amount of 45,052 lbs. and damaged cotton of 5,329 lbs. The market value of this kind of cotton on October 22, 1949 was 51½¢ per lb. so that the market value of the damaged cotton was $2,744.44. The expenses incurred in salvage and reconditioning was $1,139.74. This cotton sold for $700 so that the net loss to Grace was $3,-184.18. As above stated, I am of the opinion that this amount should be diminished by 10% and so the award to Grace will be $2,865.76.

The other shipper, Weil Brothers, was the owner of 105 bales. The net weight of this shipment was 59,818 lbs. of which 41,-659 lbs. was reconditioned and sound and 18,159 lbs. was damaged. The market value of this kind of cotton was 50¢ per lb. and so the market value of the damaged cotton must be $9,079.50. Reconditioning and salvage costs amounted to $1,302.48 and the net proceeds of the sale was $2,000. So the loss to Weil Brothers was $8,381.98. I am reducing this also by 10% and the award to this shipper will, therefore, be $7,543.79.

Libellants are entitled to a decree giving them judgment for the above amounts with interest from October 22, 1949 together with their costs; which judgment will be against Charleston Lighterage and Transfer Company and One Lighter, approximately 80 feet long and 30 feet wide. The claims and libels against the other parties are dismissed with their costs. The decree will further provide for the sale of One Lighter, the proceeds to be applied on the judgments proportionately with the like disposition of the freight money of $15 which has been paid into this court.

Appropriate Findings of Fact, Conclusions of Law and a Decree will be filed.