### W. R. GRACE & CO. et al. v. CHARLESTON LIGHTERAGE & TRANSFER CO. et al.

### No. 6349.

United States Court of Appeals Fourth Circuit.

Argued Nov. 14, 1951.

Decided Jan. 3, 1952.

540

Charles W. Waring, Charleston, S. C. and Horace T. Atkins, New York City (Waring & Brockinton, Charleston, S. C. and Atkins & Weymar, New York City, on brief), for appellants and cross-appellees.

G. L. B. Rivers, Charleston, S. C. (Hagood, Rivers & Young, Charleston, S. C., on brief), for appellees and cross-appellants Charleston Lighterage & Transfer Co., One Lighter, and Charleston Constructors, Inc.

Frederick H. Horlbeck, Charleston, S. C. (Mitchell & Horlbeck, Charleston, S. C., on brief), for appellees White Stack Towing Corp. and Tug Fort Sumter.

Before PARKER, Chief Judge, DOBIE, Circuit Judge, and CHESNUT, District Judge.

DOBIE, Circuit Judge.

W. R. Grace and Company (hereinafter called Grace) filed in the United States District Court for the Eastern District of South Carolina, its libel against Charleston Lighterage and Transfer Company (hereinafter called Lighterage), the Barge, One Lighter, White Stack Towing Corporation (hereinafter called White Stack) and its tug, Fort Sumter. In a separate suit Adolph Weil and others, trading as Weil Brothers (hereinafter referred to as Weil), filed their libel against these same respondents. Upon failure of any of these respondents to implead, the owner of One Lighter, Charleston Constructors, Incorporated, (hereinafter referred to as Constructors), libellants requested and the District Court permitted them to amend their complaint so as to make Constructors a party to both suits. Since the issues in both causes are the same, the cases were consolidated for trial and this appeal.

Early in the morning of October 22, 1949, the steamship Santa Isabel arrived in Charleston harbor with a quantity of Peruvian cotton consigned to, and owned by, Grace and Weil. Under custom regulations, imported cotton must be subjected to a fumigation process before it can be shipped from the port of entry. The established practice in Charleston is to have all incoming cotton taken by barge or lighter directly from the ship on which it arrives to the fumigation plant of the South Carolina Ports Authority, located at North Charleston.

Lighterage had agreed with the owners of the Santa Isabel to transport cotton arriving on their vessels to the fumigation plant and upon being notified that cotton was arriving on the Santa Isabel, leased two lighters to move the cotton in question. One of these barges, known as One Lighter,

was obtained from Constructors. The only tug owned by Lighterage was at this time engaged on other work under a priority agreement. Lighterage, therefore, engaged from White Stack the services of its tug, Fort Sumter.

During the morning of October 22, these two leased lighters were pulled alongside the Santa Isabel and stevedores proceeded to unload the cotton from the hold of that vessel onto the lighters. When this operation was completed, the loaded lighters were towed to the Seaboard Wharf, there to await the arrival of the Fort Sumter for the tow upstream.

It is undisputed that the One Lighter was properly loaded, for in accordance with good nautical practice, the cotton was so placed on the lighter as to make one end of the barge heavier than the other end. The obvious advantage in loading the lighter in this manner is that when she is pulled with the light end forward, the danger of her being swamped or taking water over the bow is minimized.

There is a great deal of conflict in the evidence as to how these loaded lighters were tied together. Witnesses for Grace, Weil and Constructors stated that the lighters were tied end to end, with the large barge to the North and with One Lighter, the smaller of the lighters, lashed with its heavier end to the stern of the large lighter. The crew of the Fort Sumter testified, however, that the light end of the One Lighter was secured to the stern of the large barge.

Around four P.M., the Fort Sumter left her berth and headed upstream with the tide to pick up the lighters. As she approached them, the Captain made a complete circle in order to come up to the barges against the tide.

Witnesses from the Fort Sumter testified that the large lighter was secured to the starboard side of the tug, and in this position the barges were "nudged" out into the river. It was at this time that the Captain determined that the lighters should be rearranged, since the heavy end of One Lighter was pointing forward. After proceeding upstream a very short distance to a place where the contemplated maneuver could be

undertaken without danger of colliding with the shore installations, One Lighter was swung around the bow of the Fort Sumter and lashed to the port side of the tug by two hawsers. In this position, the light end of One Lighter was forward. One Reynolds, an employee of Lighterage, denied that any such maneuver was performed and he stated that he last observed the Fort Sumter moving upstream with both lighters lashed to her starboard side and with the heavier end of One Lighter pointing forward.

When the Fort Sumter and her tow had been underway a very short time, one of the crew noticed that One Lighter was rather low in the water and he notified the Captain. The Captain immediately ordered his engines slowed, and upon observing that One Lighter was sinking, he ordered the engines cut. By this time, the forward line running from the One Lighter to the tug had come loose as the bitt on the lighter to which the hawser was attached gave way. The lighter was veering away from the tug, and the crew of the Fort Sumter was paying out the one rope still holding the two vessels, in order to prevent a collision. Suddenly, the last hawser came loose when a second bitt was broken from the deck of the lighter. The One Lighter was now sinking rapidly at one end and some of the bales of cotton had already slipped from the deck into the water. The Captain radioed for help and the Cecelia, a sistership of the Fort Sumter, appeared with pumping apparatus.

By nightfall, the Fort Sumter with the aid of another tug, the Josephine, had succeeded in beaching One Lighter on the eastern shore of the river. Darkness prevented any further salvage but on the following morning, One Lighter was raised and towed to her destination. Most of the cargo had by this time been recovered but considerable damage had been done to the cotton because of exposure to salt water.

At the time of the sinking, the weather was clear and the water calm, nor was there any wash or wake from passing vessels.

The evidence presented at the trial shows that Constructors had purchased One Light-er in 1946. Some repairs had been made at that time but none subsequently. This lighter was eighty feet long with a thirty foot beam and was of ordinary wood construction. Each of the lighter's ends was cut on a slant so as to form overheads known as "rakes". The bottom was sheathed, and this sheathing ran up the sides some four feet. The deck, which was neither caulked nor water-proofed, was a flat wooden surface whose construction did not permit storage of cargo in the hold beneath.

On the day of the sinking, One Lighter had been inspected by an employee of Lighterage, who later testified that the barge appeared seaworthy to him. Upon examination after the sinking, a crack, some two to four inches wide and four feet long, was discovered between two transverse planks on one of the "rakes" just above where the sheathing up the side ended. Examination revealed that the wooden planks were soft and beginning to rot. Rot was also discovered on the deck around the area to which the bitts which had pulled up were anchored.

Upon the facts the District Court determined that the sinking was not due to the faulty handling of the Fort Sumter but rather to the unseaworthiness of One Lighter. The Court therefore entered judgment *in personam* against Lighterage and *in rem* against One Lighter. Constructors and White Stack were absolved of liability. The damages of Grace were assessed at $3,184.18 and those of Weil at $8,381.98. The Court, however, ordered that these damages be reduced by 10% due to the lack of diligence displayed by libellants in conducting salvage operations. From this decree, Grace, Weil, Constructors, as owner of One Lighter, and Lighterage have appealed to us.

The first question presented by this appeal is whether the cause of the sinking was the unseaworthiness of One Lighter, faulty handling of the lighter by the Fort Sumter, or a combination of these two causes.

As has already been pointed out, there is a great deal of dispute among the witnesses as to the handling of the lighter

543

by the tug. The tug's Captain and his crew maintain that the lighter was pulled around the bow of the tug and secured to the port side of the tug, with the lighter and higher end of the barge pointing forward. Reynolds, on the other hand, contends that One Lighter was never switched around and that he observed the tug moving rapidly upstream with both lighters secured to her starboard side and with the heavier and lower end of One Lighter pointing forward. It well to note, as did the District Judge, that it may be that Reynolds did not observe the moving tow long enough to see the maneuver testified to by the witnesses from the Fort Sumter, for the Captain stated that he had proceeded upstream a short distance before rearranging the lighters. The District Court resolved this conflict of evidence in favor of the tug, and we are not free to reverse that determination unless it be proven clearly erroneous. This we cannot do, for the finding that there was no improper handling of the lighter by the Fort Sumter has ample support in the record before us.

It was also contended that the Fort Sumter, with the lighters in tow, proceeded at a rapid rate of speed, which was negligent, and which contributed to the loss of the cotton. Here again, there was serious conflict in the evidence and we must sustain the finding of the District Judge that the tug, in this respect also, was free from fault.

We also agree with the finding of the lower court that One Lighter was unseaworthy. The fact that no repairs were made on the lighter between 1946 and the time of the sinking, the lack of any proper inspection, the cracks discovered in one of the "rakes" as well as the rot on the transverse planks on the "rake" and on the deck to which the bitts were anchored, can lead only to the conclusion that the lighter was unseaworthy. As was said by the District Court [98 F.Supp. 263]: "* * * I do find considerable evidence that the lighter on which the cotton was placed was in very poor, even in bad condition. It is true that some witnesses testified that they considered the lighter 'seaworthy' adding that such opinion was based on the character of the work which it was called upon to do.

Now this leaves a margin of speculation. It probably was seaworthy for the purpose to which the Constructors used it for hauling materials, tools, etc. It probably was seaworthy from time to time when used for transporting cargo. But this day, with a very heavy load of cargo upon it, it failed and sank. The evidence of inspection and care was rather superficial. Nothing apparently had been done for the upkeep of the lighter; and there is no evidence of any inspection at any time since 1946 excepting the casual looking at it from the outside or occasionally looking at it inside with a flashlight and then mainly for the purpose of ascertaining whether any amount of water had collected in the hold."

■■■ We find no difficulty in holding Lighterage liable for the damages sustained by libellants, for there exists in every contract of affreightment an implied warranty that the vessel to be used in transporting the cargo is seaworthy. The Caledonia, 157 U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644; The Edwin I. Morrison, 153 U.S. 199, 14 S.Ct. 823, 38 L.Ed. 688; W. T. Lockett Co. v. Cunard S. S. Co., D.C., 21 F.2d 191; The G. R. Crowe, D.C., 287 F. 426, 427, affirmed, 2 Cir., 294 F. 506, certiorari denied 264 U.S. 586, 44 S.Ct. 335, 68 L.Ed. 862.

■■■ With the District Judge's conclusion that Constructors may properly limit its liability under 46 U.S.C.A. § 183 to the value of One Lighter and the earned freight, we do no agree. This finding is based upon the proposition that there was no privity of contract between libellants and Constructors, nor was Constructors "guilty of any negligence or knowledge of unseaworthiness of the lighter".

It is well established that the bailee of a vessel can recover from the owners for damages resulting from the unseaworthiness of the chartered vessel at the time of its charter. Cullen Fuel Co. v. W. E. Hedger, Inc., 290 U.S. 82, 54 S.Ct. 10, 78 L.Ed. 189; Pendleton v. Benner Line, 246 U.S. 353, 38 S.Ct. 330, 62 L.Ed. 770. Nor is such recovery limited to damages allowable under the Limitation of Liability Act, 46 U.S.C.A. § 181 et seq., if the basis of recovery is unseaworthiness. In view of the facts upon which the court below found

One Lighter unseaworthy—lack of proper inspection and rot on the vessel, we conclude that the lighter was unseaworthy at the time of the charter, and Constructors, as owner, is therefore, liable to Lighterage as charterer. It is no defense for Constructors to say that the lighter was sufficiently seaworthy for the purposes for which it was used by that Company, for when Lighterage chartered the lighter, Constructors impliedly warranted that it was seaworthy for the purposes for which it was to be used. We, therefore, hold that Constructors is liable without limitation of liability.

█ Since Lighterage is liable to libellants and since Constructors is liable to Lighterage, ultimate liability here rests upon Constructors. All these parties are properly before this Court and we can see no reason why Constructors may not properly be held liable in personam to libellants. Shamrock Towing Co. v. Fichter Steel Corp., 2 Cir., 155 F.2d 69; S. C. Loveland Co., Inc., v. Eastern States Farmer's Exchange, 3 Cir., 92 F.2d 180, 181; Reliance Marine Transp. & Const. Corp. v. The Tug Skipper, D.C., 89 F.Supp. 272, 273. Cf. Davis v. Dittmar, 2 Cir., 6 F.2d 141. It appears to us that circuity of action should be avoided. As was said by Judge Learned Hand in Cannella v. Lykes Brothers S.S. Co., 2 Cir., 174 F.2d 794, 796: "* * * An owner, who has demised his ship, is not indeed liable to any one but the demisee under his warranty of seaworthiness for any loss or injury suffered during the demise. Such liabilities sound in contract and he has not made any contract with any one else. On the other hand, if the demisee has become liable to a third person because of an unseaworthiness existing at the time of the demise, the demisee may recover from the owner on the owner's warranty, whether the demisee is liable under his own warranty of seaworthiness, or under an imposed liability such as that to a longshoreman. Thus the ultimate liability rests upon the owner for any loss or injury occasioned by the ship's unseaworthiness at the time of delivery. If the demisee becomes insolvent or for any other reason is judgment proof, the longshoreman could probably join in one action the demisee and the owner; and at any rate he could accomplish the same result by two separate actions. Thus in final result to impose upon the owner-demisor a direct personal liability to a longshoreman for injuries resulting from an unseaworthiness antedating delivery, is to impose no greater loss than could be made to fall upon him as the law is. It would merely avoid a circuity of action."

We do not feel that our decision here in any way violates the intent of the Limitation of Liability Act, 46 U.S.C.A. § 181 et seq., for, as has already been pointed out, unseaworthiness of a ship is not a risk excepted by that Act.

█ The next question to be considered is whether the District Court erred in ordering a ten per cent reduction in the damages awarded libellants because of their alleged lack of diligence in conducting salvage operations. In our opinion, this reduction was a mere speculative reduction for which there exists no basis in fact. The owners of the cotton were in New York and since the accident occurred on a Saturday, they received no notification of their loss until the following Monday. A survey was immediately ordered. On October 26, the owners attempted to obtain the services of Oakdene Compress to re-handle the cotton. When it was found that this company could not do the work, City Compress and Warehouse Company was employed. Some of this cotton was recovered while floating in the water; some was recovered from the beach upon which it had been washed. Between October 26th and October 31st, the cotton was inspected and identified by representatives of the owners, was weighed and fumigated by South Carolina State Ports Authority, was sampled by the United States Department of Agriculture, was passed through customs and was turned over to Seaboard Railroad for transportation from North Charleston to Charleston. Also, during this interim, the matter was referred by the owners to their Underwriters in New York City and approval was given by the Underwriters to proceed.

In view of these efforts on the part of the owners, we think the libellants and their representatives acted reasonably by taking prompt and effective steps to minimize the damages to the cotton. Libellants must, accordingly, be allowed their full damages without deduction. In this connection we are impressed by the testimony of witnesses Lucas and Canady.

■ A final and somewhat ancillary question remains, as to whether the District Court erred in permitting certain equipment to be removed from One Lighter after the lighter had been attached in this proceeding. The evidence indicates that after the lighter had been raised, following the sinking in question, this equipment was leased by Constructors and placed on the lighter to perform other work. Although the question is not free of difficulty, we agree with this conclusion by the District Judge: "* * * the apparatus attached and to be used on the lighter was indeed useful in work to be performed by the owners of the lighter but it was not necessary equipment for the use of a lighter in its normal general purposes. It was the intention of the petitioner to remove the equipment as soon as the specific job was finished. And it will be noted that at the time when the lighter sank causing these cases, no such equipment was aboard and when subsequently the owners of the lighter put this equipment aboard they were entirely unaware that libels were impending."

The decree of the District Court is affirmed in so far as it exonerates the White Stack Towing Corporation and the tug Fort Sumter of liability and in so far as it adjudicates in rem liability on the part of One Lighter, and holds that the removal of the equipment from One Lighter was proper. It is reversed in so far as it exonerates Charleston Constructors from liability in personam and in so far as it reduces the award of damages by 10% from the damages actually sustained. The cause will be remanded with direction to the District Court to award libellants the full amount of their damages, without the 10% deduction, against both the Charleston Lighterage and Transfer Company and Charleston Constructors, with provision that the former recover over against the latter any sum that the former may be required to pay under the court's decree.

Affirmed in part, reversed in part, and remanded with directions.