259 F.2d 458
 STATES STEAMSHIP COMPANY, a corporation, Appellant,
v.
UNITED STATES of America, Atlantic Mutual Insurance Company, Pacific National Fire Insurance Company and The Dominion of Canada, Appellees.
ATLANTIC MUTUAL INSURANCE COMPANY, Appellant,
v.
STATES STEAMSHIP COMPANY, a corporation, United States of America and The Dominion of Canada, Appellees.
PACIFIC NATIONAL FIRE INSURANCE COMPANY, Appellant,
v.
STATES STEAMSHIP COMPANY, a corporation, United States of America and The Dominion of Canada, Appellees.
UNITED STATES of America, Appellant,
v.
STATES STEAMSHIP COMPANY, Atlantic Mutual Insurance Company, Pacific National Fire Insurance Company and The Dominion of Canada, Appellees.
The DOMINION OF CANADA, Appellant,
v.
STATES STEAMSHIP COMPANY, Atlantic Mutual Insurance Company, Pacific National Fire Insurance Company and The United States of America, Appellees.
 No. 15131.
 United States Court of Appeals Ninth Circuit.
 May 31, 1957.
 Modified on Petitions for Rehearing November 15, 1957.
 As Amended on Denial of Rehearing on Limitation August 20, 1958.
 
 Wood, Matthiessen, Wood & Tatum, Erskine Wood, Portland, Or., Bogle, Bogle & Gates, Stanley B. Long, Seattle, Wash., for appellant States S.S. Co.
 Koerner, Young, McColloch & Dezendorf, John Gordon Gearin, George B. Campbell, Portland, Or., for appellants Atlantic Mut. Ins. Co. & Pacific Nat. Fire Ins. Co.
 Summers, Bucey & Howard, Charles B. Howard, Seattle, Wash., for appellant Dominion of Canada.
 George Cochran Doub, Asst. Atty. Gen., Leavenworth Colby, Attorney, Department of Justice, Washington, D.C., Keith R. Ferguson, Sp. Asst. to Atty. Gen., Kenneth E. Kulzick, Los Angeles, Cal., C. E. Luckey, U.S. Atty., Portland, Or., for appellant-appellee, U.S.A.
 Before DENMAN, Chief Judge, and STEPHENS and POPE, Circuit Judges.
 DENMAN, Chief Judge.
 
 
 1
 These are appeals from an interlocutory decree of the United States District Court for the District of Oregon on the petition of States Steamship Company, hereafter the Company, for exoneration from or limitation of liability for the total loss of the cargo of the S.S. Pennsylvania, which sank with all hands in the Gulf of Alaska on January 9, 1952, while enroute over the Great Circle route from Seattle, Washington, to Yokohama, Japan.
 
 
 2
 The district court held (a) that the Pennsylvania was not lost from a peril of the sea; (b) that she was unseaworthy; (c) that the employees of the Company had not exercised due diligence to make her seaworthy, but (d) that the Company was without privity in or knowledge of her unseaworthiness and hence was entitled to limit its liability to the pending freight.
 
 
 3
 Here there are no claims for loss of life. For loss of cargo, 46 U.S.C.A. § 183(a) provides that "the liability of the owner of any vessel * * * for any loss * * * incurred, without the privity or knowledge of such owner or owners, shall not * * * exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." The interest of the owner in the vessel is its value after the events leading to the loss of the cargo,[1] here of no value since the vessel was a total loss.
 
 
 4
 The Company appeals from the denial of its exoneration from liability contending that the evidence conclusively shows that the Pennsylvania was lost because of a peril of the sea (46 U.S.C.A. § 1304 (2) (c)), and that she was not unseaworthy.
 
 
 5
 The cargo claimants, the United States, the Dominion of Canada, Atlantic Mutual Insurance Co., Pacific National Fire Insurance Co., hereafter Cargo, appeal from the limitation of liability to the pending freight contending the evidence shows that the Company was privy to and had knowledge of her unseaworthiness.
 
 
 6
 Much of the pertinent testimony supporting the court's decision is viva voce, hence this admiralty appeal is, in effect, governed by Rule 52(a) Fed.Rules Civ.Proc., 28 U.S.C.A. that:
 
 
 7
 "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." McAllister v. United States, 1954, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20.
 
 
 8
 Facts concerning the ship's experience before sinking. The Pennsylvania was a Victory ship, length 455 feet, beam 62 feet, gross tonnage 7,608 tons. On January 5, 1952, the ship left Seattle, and on January 9, 1952, sank in a storm in the Gulf of Alaska about 505 miles WNW of Seattle. Since no wreckage was ever found and there were no survivors, the only information concerning the sinking is in the radiograms received from the ship during the storm. These radiograms show: At 5:35 ship's time (approx.) January 9, 1952, the ship reported WNW wind at force 9 on the Beaufort scale and "mountainous" seas. A little later she reported a 14-foot crack beginning in a butt weld in the sheer strake between frames 93 and 94 running down her side, "very high westerly sea", and stated she would turn around to return to Seattle as soon as possible. At 6:10 she reported she was taking water through the crack, but that her pumps were holding. At 9:27 she reported that she was steering a course for Seattle (i. e., had succeeded in turning around), "can't steer at present taking water in number one hold and engineroom". At 10:05 a message received from the ship stated that she was taking water in number one hold "down by head cannot steer or get forward to see where the trouble is pumps holding in engineroom. If we cannot fix steering gear will require assistance. Very high seas. Cannot get on deck at present. Deck load adrift taking tarpaulins off forward hatches. Cannot get on deck to rescue." [Emphasis supplied.] The first SOS was sent at 10:20 in a message stating she was taking water in engineroom, number one hold, and was down by the head. At 11:15 she reported tarpaulins in forward hatches were still holding, that she was taking water in number one hold and engineroom, and was using hand steering. At 3:05 P.M. she reported steering gear fixed but unable to steer as rudder too far out of the water, and that number two hatch was open and full of water. At 3:22 the last message stated that the crew was abandoning ship.
 
 
 9
 The bills of lading provided that the Company was not liable for the loss of the cargo by a peril of the sea. Here the loss of the cargo being admitted the burden of proof is on the Company to prove that such a peril caused its loss.
 
 
 10
 The accepted definition of a peril of the sea is that of Judge Learned Hand's opinion for the Second Circuit, who stated that it means "nothing more * * * than that the weather encountered must be too much for a well-found vessel to withstand." Philippine Sugar Centrals Agency v. Kokusai Kisen Kabushiki Kaisha, 2 Cir., 1939, 106 F.2d 32, 34-35.
 
 
 11
 We think the evidence sustains the district court's finding that the vessel was not lost by a peril of the sea. The messages from the Pennsylvania described the seas as very heavy and that after a crack in her hull she was returning to Seattle. After the vessel had been able to turn around in the heavy seas to return to Seattle, she had trouble with her steering gear and then wirelessed: "If we cannot fix steering gear will require assistance." [Emphasis added.] From this the court could draw the inference that it was the inherent condition of the ship's hull rather than the heavy seas which caused her sinking.
 
 
 12
 In the deposition of John W. McMunagle, captain of the Canadian Weather Ship, Stonetown, he testified as follows:
 
 
 13
 "By Mr. Gearin: Q. Captain, what would you say would be the usual and expected weather for the vicinity of Weather Station Papa in the winter months? A. Well, you can expect very rough seas and gales of varying degrees of intensity practically throughout the winter.
 
 
 14
 "Q. Was there anything unusual or unanticipated about the weather conditions that existed in the month of January, 1952, in the vicinity of Weather Station Papa? A. No.
 
 
 15
 "Q. Do you have an independent recollection of winter weather in the vicinity of Station Papa which is not shown on your log? A. Yes, we have had weather just as bad in the late fall, — in September and October.
 
 
 16
 "Mr. Wood: Just as bad as what?
 
 
 17
 "The Witness: Pardon?
 
 
 18
 "Mr. Wood: Just as bad as what?
 
 
 19
 "The Witness: As bad as what we have had in the winter months of January and February. We have had gale force in late fall."
 
 
 20
 McMunagle turned his ship around in the heavy seas, responding to the Pennsylvania's call for assistance and testified:
 
 
 21
 "Q. At any time when you were searching for the Pennsylvania were you unduly apprehensive for the safety of your vessel? A. No."
 
 
 22
 Seiichi Mori, the captain of a Japanese ship, testifying through an interpreter:
 
 
 23
 "Q. Captain, was there anything unusual that you recall about the weather and sea conditions that you encountered during this period from January 7th through January 9th? A. Yes, big storm.
 
 
 24
 "Q. Big storm? A. Yes, but in winter times, North Pacific Ocean, sometimes we expect the same kind of storm then.
 
 
 25
 "Q. Was there anything unprecedented about the storm that you encountered during this period, for this time of the year?
 
 
 26
 "The Witness: (Through Interpreter) Not unusual.
 
 
 27
 "Mr. Howard: Q. Not unusual?
 
 
 28
 "A. No, but quite a sized storm."
 
 
 29
 He further stated that a seaworthy vessel fully loaded could stand the weather from January 7th through January 9th.
 
 
 30
 Robert M. Kinzebach is a meteorologist by profession who had three years' service as a weather officer, five years with the Pan American Airways forecasting between Seattle and Alaska and about three years in the Weather Bureau in Seattle. After an extended examination as to the character of the weather when the Pennsylvania was sunk compared to that of his long study of weather conditions in this area, he testified:
 
 
 31
 "Q. All right, sir. How would you characterize the Pennsylvania storm, Mr. Kinzebach? A. Well, it was — I wouldn't say a typical winter storm, but it was not an unusual one." Remembering that the wind velocity of the storm in which the Pennsylvania was lost was 9, his further testimony is pertinent.
 
 
 32
 "Mr. Gearin: Q. During the period of time that you have made your investigation will you tell the Court how many times wind forces of 10 or over were recorded? [Emphasis added.] A. There were 133.
 
 
 33
 "Mr. Gearin: Q. How many times during that period of time was the wind force in excess of 11 reported? A. 43."
 
 
 34
 Concerning the wind force reported by the ship at 9, the Company's own Marine Superintendent, Captain Dyer, stated:
 
 
 35
 "Mr. Levinson: From your experience as a Master Mariner and as Port Captain, a Force 9 wind with heavy and confused seas is nothing unusual in the North Pacific in January is it? A. No."
 
 
 36
 Chief Engineer Vallet, the Port Engineer for twelve years, testified that the Company's ships suffered "heavy weather damage on practically all the voyages," and when asked about the following weather
 
 
 37
 "Force of winds 7 to 8, 8 and 8 to 9, seas described as follows, `very rough west by south sea, long high west by south swell, very high swell, heavy confused west — heavy confused south to west swell, vessel rolling and pitching heavily at times, seas too rough to maintain original course. * * *"
 
 
 38
 he answered
 
 
 39
 "That is just a vessel going through a regular storm which happens practically on all voyages."
 
 
 40
 The evidence further shows that there were sixteen other ships in the same storm all of which rode it safely through though some were badly battered.
 
 
 41
 The appellant contends that we must weigh against all this viva voce testimony, a great amount of testimony by deposition from which the court could have held the storm was of such overwhelming proportions that it amounted to a peril of the sea. We cannot say the court's finding was clearly erroneous.
 
 
 42
 The Company maintained its burden of proof that it was not privy to and lacked knowledge of any unseaworthiness of the vessel. It is contended by the Cargo that the ship being held unseaworthy as to its hull, stearing gear and stowage of its deck cargo, the court erred in its finding that this was not known to the owners making them privy to her unseaworthiness prior to her departure on the fatal voyage. The parties agreed that the representative of the Company whose privity to or knowledge of the vessel's unseaworthiness must be imputed to it was its port engineer Vallet, who had been their acting marine superintendent for about two months during the illness of his superior, marine superintendent Dyer.
 
 
 43
 The district court held that the vessel was unseaworthy, stating:
 
 
 44
 "IV.
 
 
 45
 "The contributory facts responsible for the sinking of the S.S. Pennsylvania are found in the radiograms sent from the vessel immediately prior to her sinking, stating that the vessel sustained a crack down the port side between frames 93 and 94; that the crack started in the sheer strake and ran down about 14 feet; that sea water entered the engine room of the vessel through this crack; that the vessel sustained a failure or breakdown of its steering systems and for a time the vessel was completely unable to steer by any method in heavy seas then existing and that if they could not fix the steering gear that they would need immediate assistance; that the vessel was taking water in the No. 1 hold; that the deck cargo on the forward deck came adrift and was taking off the tarpaulins on the forward hatches, and that the No. 2 hatch was open and full of water.
 
 
 46
 "V.
 
 
 47
 "That the foregoing faults, failures, breakdowns and defects set forth in the preceding finding IV, together with the crack sensitiveness of the vessel to extreme cold weather by reason of a former 22-foot crack in her deck occurring on her previous Voyage V, which crack was fully repaired, were factors of unseaworthiness culminating from the unseaworthy condition of the vessel at the inception of her voyage which prevented her from meeting the expected and to be anticipated weather conditions and proximately caused her sinking, with the total loss of the vessel, with all of her crew and personnel aboard and all of her cargo."
 
 
 48
 We think there is ample evidence supporting these findings, and the further finding that due diligence was not used to make the Pennsylvania seaworthy for this winter voyage. The Company is not entitled to the complete exoneration from liability under 46 U.S. C.A. § 1304, and the question remains whether it can limit its liability to the vessel's pending freight under 46 U.S. C.A. § 183(a), as amended subsequent to the enactment of § 1304, the pertinent portions of which are:
 
 
 49
 "(a) The liability of the owner of any vessel, * * * for any * * * loss * * * of any property, goods, or merchandise shipped or put on board of such vessel * * without the privity or knowledge of such owner or owners, shall not * * * exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."
 
 
 50
 With regard to Superintendent Vallet's knowledge of the defect in the steering mechanism, there is evidence that none had been reported to him prior to the vessel's last voyage. There had been operational checks by the Coast Guard, and tests while at sea by officers, who did not report any defects to Vallet. The Coast Guard inspectors, who apparently checked the steering gear fully short of dismantling the equipment, testified that it was in good condition. The American Bureau Surveyor agreed.
 
 
 51
 As to his knowledge of the "crack sensitivity" of the vessel, the previous crack in her deck plates had been completely repaired. Fragments of her steel were sent to the National Bureau of Standards, and a metallurgist of the Bureau testified that its tensile properties were better than the requirements in effect when the ship was built. The crack on the port side and the taking of water in the No. 1 hold are not imputable to the knowledge or privity of Vallet.
 
 
 52
 As to Vallet's knowledge of the stowage of the ship, that was entirely outside of his duties, the captain having entire charge of it. It is not suggested that there was such an obvious defect in the stowage of the deck cargo that one who looked at the vessel as she lay in the dock must necessarily have known its deck cargo would come adrift in a heavy sea.
 
 
 53
 The decree limiting the Company's liability is affirmed.
 
 
 
 Notes:
 
 
 [1]
 The City of Norwich, 1886, 118 U.S. 468, 492, 6 S.Ct. 1150, 30 L.Ed. 134
 
 
 On Petitions for Rehearing
 
 54
 Before STEPHENS, Chief Judge, and DENMAN and POPE, Circuit Judges.
 
 
 55
 POPE, Circuit Judge.
 
 
 56
 Following our decision in this case on May 31, 1957, all of the parties filed petitions for rehearing. The petition of States Steamship Company is denied. Upon consideration of the petitions of the United States and of Atlantic Mutual Insurance Company, Pacific National Fire Insurance Company and The Dominion of Canada, that portion of our former opinion which affirmed the decree limiting liability is withdrawn and this opinion is substituted therefor. The remainder of our former opinion, rejecting the appeal of States Steamship Company, stands.
 
 
 57
 The details of the sinking of the S.S. Pennsylvania, out of which these proceedings grew, are stated in our former opinion. As there disclosed the vessel sailed on January 5, 1952, on what was designated her Voyage 6, from the Port of Seattle for the Port of Yokohama. She sank during a storm in the Gulf of Alaska, with a total loss of the vessel and all of her crew. The appeals here are by States Steamship Company, owner and operator of the vessel, from the portion of the interlocutory decree denying exoneration, and by the other named parties, cargo claimants, from that part of the decree granting limitation of liability.
 
 
 58
 A further study of the record here presented convinces us not only that the findings of the court below are insufficient to support a decree limiting liability, but that States Steamship Company failed to sustain its burden of proof to warrant a limitation of liability. It clearly shows that the unseaworthiness which the court found to be the cause of the loss, and due to the owner's lack of due diligence, was with the privity or knowledge of its managerial employees.
 
 
 59
 First note the findings themselves: In Finding III it is said that "The sole and proximate cause of the sinking of the Pennsylvania" was "her own unseaworthiness." This is followed by Finding IV listing the contributory factors responsible for the sinking. Finding V named the factors of unseaworthiness existing at the inception of the voyage as follows:
 
 
 60
 "That the foregoing faults, failures, breakdowns and defects set forth in the preceding Finding IV, together with the crack sensitiveness of the vessel to extreme cold weather by reason of a former 22-foot crack in her deck occurring on her previous Voyage V, which crack was fully repaired, were factors of unseaworthiness culminating from the unseaworthy condition of the vessel at the inception of her voyage which prevented her from meeting the expected and to be anticipated weather conditions and proximately caused her sinking, with the total loss of the vessel, with all of her crew and personnel aboard and all of her cargo."
 
 
 61
 Then follows Finding VI which is the significant one here and which is as follows:
 
 
 62
 "That the evidence is insufficient to show that petitioner used the due diligence required by law to make the vessel seaworthy at the inception of her voyage, and the Court finds that the petitioner did not use the due diligence required by law to make the vessel seaworthy and to entitle it to exoneration from liability."
 
 Finding VII is as follows:
 
 63
 "That the evidence is sufficient to show that the unseaworthy condition of the vessel at the inception of her voyage was without the privity or knowledge of petitioner, and the Court finds that the unseaworthy condition of the vessel at the inception of her voyage was not with the privity and knowledge of the petitioner."
 
 
 64
 Before there could be a finding or conclusion such as Finding VII there would have to be a finding based on evidence that the negligence which the court found existed was that of a non-supervisory agent such as a master or an operating engineer.
 
 
 65
 For application here is the Limitation of Liability Act, which provides in § 183(a) of Title 46 U.S.C.A.: "The liability of the owner of any vessel, * * * for any * * * loss * * * of any property, goods, or merchandise shipped or put on board of such vessel * * * without the privity or knowledge of such owner or owners, shall not * * * exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." As indicated in Coryell v. Phipps, 317 U.S. 406, 409, 63 S.Ct. 291, 293, 87 L.Ed. 363, the burden of proof in such cases "is on those who seek the benefit" of the section. As there stated, and hereafter noted, "liability may not be limited under the statute where the negligence is that of an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred."
 
 
 66
 The reason there is no basis for the limitation here is that the only persons whose negligence could have operated to bring about the unseaworthy condition, the only persons to whom the lack of due diligence could possibly be charged, were persons who were managing officers of the corporation. The court not only did not find that the failure to exercise due diligence was that of minor or subordinate employees, but the court could not have made such a finding.
 
 
 67
 The only persons who were on the scene and had anything to do with these factors of unseaworthiness were managerial employees. The phase of the business out of which the loss or injury occurred included the "factors of unseaworthiness" which the trial court in its Finding V, supra, found caused the sinking of the Pennsylvania. We are of the opinion now, as we decided before, that there was ample evidence supporting that finding. One of those factors was "the crack sensitiveness of the vessel to extreme cold weather by reason of a former 22 foot crack in her deck occurring on her previous Voyage V."
 
 
 68
 To illustrate how the only possible proof of lack of due diligence which the court has found related to acts or neglects chargeable to supervisory personnel only we first consider this crack sensitiveness of the vessel to extreme cold weather, and the evidence relating to it.
 
 
 69
 Lester A. Vallet was throughout the period of time here involved port engineer of the company. As he put it: "I am in charge of the maintenance and repair of all the vessels." During the month or two preceding the loss of the Pennsylvania (and at the time she was cleared for sailing on her fatal trip), Vallet was also performing the additional duties of the marine superintendent who was away at the time. Vallet was the officer charged with an extensive investigation of the vessel in December, 1950, shortly before the petitioning company purchased her from the Maritime Administration. He was assisted in this by Mr. Brenneke, who was assistant port engineer. Vallet drew up the specifications for certain alterations in the vessel which were made after it was purchased. It was the practice of Vallet to board a returning vessel on arrival and to examine it for damages that had occurred on the voyage.[1] On the fifth voyage of the Pennsylvania the 22 foot crack in the ship's deck, which is referred to in Finding V, occurred while the vessel was out at sea enroute from San Francisco to Yokohama. The master was asked to return to the closest and safest port and the vessel turned around and went to Portland. There the American Bureau of Shipping and the Coast Guard were called in to inspect the damage and Vallet was in attendance to inspect the survey. After the survey Vallet prepared the specifications for the repair of the crack in the deck to meet the survey's recommendations.[2] It was during this inspection that Vallet noticed an indication of a crack in the deck on the port side. He concluded that this crack was in a location similar to that on the starboard side where the long crack had originated and this portion of the plate was cut out and a circular insert plate installed instead.
 
 
 70
 When the repairs mentioned were completed and the vessel was about ready to sail, Vallet carried out an inspection and thereupon discovered there was a difficulty with the steering mechanism. (See footnote 2, supra.) Vallet himself undertook to correct this. The vessel sailed from Portland and completed her voyage 5 and at the end of that voyage Mr. Brenneke met the ship at Seattle and examined it there. It was from here that it left on voyage 6. The date of sailing was January 5. Vallet testified on deposition as follows: "After the vessel cracked on Voyage 5 and she came back did you make any particular detailed inspection of the hull to see if there were other cracks anywhere on the port side? A. Mr. Brenneke was instructed to examine the ship very carefully at the time the vessel came back in Seattle and was placed on the dry dock."
 
 
 71
 All these facts lead to the conclusion that Vallet and Brenneke, both of them managerial employees or officers, between them handled every phase of the business having to do with the crack sensitiveness of the vessel and the condition of the vessel at the time she broke land on her scheduled No. 6 trip. As Vallet testified, "I was in charge of the Marine Department which in addition to the maintenance and repair of the vessel, also is charged with the obtaining of personnel and the officers for the ships and maintaining the discipline on the vessels and also supplying and storing the ships."[3] Brenneke was his No. 1 assistant, and as Vallet testified with respect to Brenneke dispatching the vessel from Seattle, "Mr. Brenneke is fully qualified and he knows the procedure to follow." There is no suggestion, much less any testimony, that any person other than these two men had anything to do with the phase of the crack sensitiveness of the boat which was one of the causes of loss. These two executives were the sole actors.
 
 
 72
 It cannot be said that the crack on the port side and the taking of water in the No. 1 hold were not imputable to the knowledge or privity of Vallet, for the trial court has not only found that these "factors of unseaworthiness culminating from the unseaworthy condition of the vessel at the inception of her voyage caused her sinking", but it has found that "petitioner did not use the due diligence required by law to make the vessel seaworthy." This language necessarily refers to Vallet. For the reasons set forth in McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20, we cannot go beyond that finding. And that finding, in that plain meaning, is supported by an abundance of evidence.
 
 
 73
 This brings us to the evidence relating to the crack sensitiveness. Vallet knew a great deal about crack sensitiveness. Not only did he have actual knowledge of the subject but there was available to him and to any one who exercised ordinary care in his position an abundance of information to demonstrate what the court has found, namely, that there was a crack sensitiveness in the vessel by reason of a former crack which made the ship unseaworthy under conditions of extreme cold weather.
 
 
 74
 Within the meaning of the section of the statute limiting liability, "knowledge means not only personal cognizance but also the means of knowledge — of which the owner or his superintendent is bound to avail himself — of contemplated loss or condition likely to produce or contribute to loss, unless appropriate means are adopted to prevent it." The Cleveco, 6 Cir., 154 F.2d 605, 613. The burden is upon the owner seeking limitation of liability "to prove lack of knowledge or of the means of knowledge on his part or that of his marine superintendent that his vessel was unseaworthy." Id. "The measure in such cases is not what the owner knows, but what he is charged with finding out." Great Atlantic and Pacific Tea Co. v. Brasileiro, 2 Cir., 159 F.2d 661, 665.
 
 
 75
 The finding that the vessel had a crack sensitiveness in extreme cold weather is based in part upon the findings made in 1946 of a board of investigation convened by order of the Secretary of the Navy to inquire into "The Design and Methods of Construction of Welded Steel Merchant Vessels." Among those findings was one that "The highest incidence of fracture occurs under the combination of low temperature and heavy seas." Vallet testified that he knew that report and had read it over at various times. He stated that he agreed with the finding quoted. The same report dealt with the tendency of a ship to have repeated casualties involving cracks and steel failures, and concludes: "The indication is that after a ship has had a casualty, it is somewhat more liable to a casualty than before the first."[4] Vallet also knew and testified that this 22 foot crack during the No. 5 voyage "was a No. 1 casualty". As explained in the investigative report referred to above, a Class 1 casualty "is a casualty involving at least a Class 1 fracture"; and a Class 1 fracture "is a fracture which has weakened the main hull structure so that the vessel is lost or is in a dangerous condition."
 
 
 76
 Not only was Vallet chargeable with knowledge when the Pennsylvania was dispatched on the No. 6 voyage on January 5, 1952, that she was a ship which had previously suffered a Class 1 fracture, that a ship which has had such a casualty was more liable to a repetition of fracture than before the first, but he had read and must have known the finding of the 1946 report that the highest incidence of fractures occurs when the combination of low temperature and heavy seas prevails. He and Brenneke knew that the ship was setting out in what was perhaps the coldest month of the year, and that most of the skippers would choose to take the Great Circle route to the Orient, for which the vessel was bound. He knew that on this Great Circle route violent storms, low temperatures and mountainous seas were to be anticipated at that time of the year, particularly in the Gulf of Alaska. When the Class 1 fracture occurred on the preceding voyage the air and sea temperatures were much less severe than those to be anticipated at the start of the voyage No. 6. A witness from the Bureau of Standards testified at the trial with respect to a sample plate taken from the Pennsylvania: "Would this plate here be sensitive in weather 30 to 40 degrees? A. It would." Vallet must have known as much. It is altogether possible that the captain did not know, as his superiors did, of the danger of operating a welded ship which had previously suffered a Class 1 fracture through an area where he was likely to encounter extreme cold and high seas. But the likely operation of the desire on the part of the captain to take the shorter Great Circle route made the more imperative the obligation of the owner to advise the captain of the advisability of avoiding operating a crack sensitive ship in these areas, and to direct that the ship be taken to her destination in Japan by a route through warmer waters where the likelihood of severe storms would have been less.
 
 
 77
 For this reason this case cannot be distinguished from The Silver Palm, 9 Cir., 94 F.2d 776, in which this court approved the district court's denial of limitation where a collision was caused by a condition of the ship's motors which required an extraordinarily long time for reversing in an emergency when the vessel was going at high speed ahead. The court found that the captain did not know of this peculiarity of the engines. The petitioner did not acquaint the captain of these reversing characteristics of the engine. This court said (at page 779): "The likely operation of the desire on the part of the captain to reach and depart from his various ports in accordance with the scheduled plan of operation made the more imperative the obligation of the owner and operator to advise Capt. Cox of the fact that, if he were running the vessel in a fog at a speed in excess of 5 knots, his vessel, unlike those otherwise driven, would have a very long period between the stopping of his motors and effective reversing."
 
 
 78
 The situation here is like that present in Spencer Kellogg & Sons Co. v. Hicks, 285 U.S. 502, 510, 52 S.Ct. 450, 76 L.Ed. 903. In that case Spencer Kellogg manufactured linseed oil. It owned and operated the "Linseed King" a launch used to ferry employees across the river from New Jersey to New York. One Stover was works manager of the company. The "Linseed King" was unfit to run through ice and Stover knew it and when there was a likelihood of ice, trips were to be made only in broad daylight. Before the day in question, one of Stover's subordinates had observed ice in the river. Said the court (285 U.S. at pages 510, 512, 52 S.Ct. at page 452): "Before allowing the ferriage operation he (Stover) was under obligation to assure himself by inquiries or by personal inspection that the Linseed King should not incur the hazard of colliding, as she did, with ice floes in the river * * *. The conditions on the morning in question could have been ascertained by Stover, if he had used reasonable diligence, and we think the evidence is adequate to support the finding that the negligence which caused the disaster was with his, and therefore with the owner's, privity or knowledge." Paraphrasing this language, it seems plain that before allowing the start of voyage 6 Vallet was under obligation to assure himself by inquiries or otherwise that the Pennsylvania should not incur the hazard of proceeding by the Great Circle route in the coldest and stormiest month of the year where she was certain to encounter temperatures which she could not stand. These hazards could have been ascertained by Vallet if he had used reasonable diligence; and the court below has found that reasonable diligence was not exercised. The court also found in Finding V that the weather referred to was "the expected and to be anticipated weather conditions."
 
 
 79
 Much is made by the petitioning company of the fact that from time to time inspections and surveys were made of the ship by the Coast Guard and the Bureau of Shipping, and that the inspectors had turned up with a clean bill of health. An examination of the actual facts of the case will show, however, that in respect to such inspections the very reasons given in the Silver Palm, supra, for denying the limitation of liability apply here in connection with the modes of inspection adopted. When the vessel was at Portland for repair of the 22 foot crack in November, 1951, the vessel was not in dry dock and only a portion of the cargo was removed so as to permit repair and inspection of the immediate area of the crack. The vessel then went to the Orient and back and was dry docked at Seattle by representatives of the American Bureau of Shipping and the Coast Guard.
 
 
 80
 Vallet did not examine the vessel personally in Seattle but Brenneke was there. He made a visual inspection of the underwater body which he testified was done in the customary manner. He found no wasted or suspicious seams or broken paint or cracks or indents from which a crack might originate. He had a probe but had no hammer. While the vessel was in dry dock representatives of the American Bureau of Shipping and of the Coast Guard made a dry dock inspection; but as Commander Hamilton testified, when he made his inspection, he had received no special information about this vessel. His report showed, and he testified, that there was not a complete investigation made of the structure of the vessel to determine if repairs or replacements were necessary because some portions of the internal structure were not accessible for examination.
 
 
 81
 Marine Surveyor Wilson who then inspected the ship for the American Bureau of Shipping testified that he received no special information concerning the vessel prior to his survey and he knew nothing outstanding against it. The record warranted the court's evident conclusion that an inspection of a vessel known to have a history of crack sensitiveness and particularly a history of a Class 1 fracture, should be much more careful and elaborate than this vessel ever had. The company itself was chargeable with knowledge of the pending inspection and yet it failed through Vallet or Brenneke or any other person to inform the inspectors of these special conditions attending the ship. In the words used in the Silver Palm, supra, all these circumstances "made the more imperative the obligation of the owner and operator to advise" of the special circumstances calling for a special inspection and a more thorough one than had been given.
 
 
 82
 Vallet met the vessel when she put in at Portland following the fracture on trip 5 and Brenneke at Seattle met her in December, 1951, when she returned after that trip and inspection occurred as above stated. It was a matter of common knowledge that the structure should have been inspected from within and below, particularly in the vicinity of the pad-eyes where cracks were apt to start. Vallet testified that at the time he made the specifications for repairs of the 22 foot crack he also ordered repair of "fracture plate No. 3 hatch; cut out crack plate in the way of the No. 3 hatch port side aft and install insert plate." He explained that he ordered this because from an underneath inspection he saw an indication of a slight crack in the way of a pad-eye which had been removed. It was a very small crack but at a point on the port side similar to the place where the large fracture had occurred on the starboard side.
 
 
 83
 Notwithstanding Vallet's knowledge of the importance of inspection of the hull under pad-eyes and from the inside, there was never possible a thorough inspection of this character after the 22 foot crack on voyage 5 and before the vessel left on voyage 6 because the ship was never unloaded and those portions of the vessel requiring such inspection was never made accessible.
 
 
 84
 Our former opinion, speaking of Vallet's knowledge of the condition of the vessel, said: "The previous crack in her deck plates had been completely repaired." This language discloses that we failed then to note the facts to which the court's finding as to the vessel's unseaworthiness related. The crack sensitiveness referred to in the findings had nothing to do with the question of whether the old crack was or was not repaired. The crack sensitiveness alluded to is "the crack sensitiveness of the vessel to extreme cold weather." In short, the technical evidence made available in these reports means that the record of the earlier crack or Class 1 fracture, is significant in respect to the crack sensitiveness in other portions of the vessel.
 
 
 85
 The more one studies the history of the Pennsylvania, the more he is driven to the discovery of additional facts which enforce the correctness of the trial court's finding that the petitioner did not exercise due diligence. The ship was equipped and built with some deep tanks, and there was adequate evidence to show that these deep tanks were so constructed as to aid and enforce the rigidity of the ship. When the petitioning company bought the ship from the Maritime Administration it was advised through Vallet not to interfere with these deep tanks. Vallet nevertheless proceeded to cut hatches in them. Prior to that time the Pennsylvania had never developed a major fracture. Thereafter she proceeded to develop the Class 1 fracture on her fifth voyage.
 
 
 86
 Another circumstance that may have prompted the trial court to find that the petitioner company did not use due diligence to make the vessel seaworthy at the inception of her voyage, was the manner in which Vallet apparently took little or no interest in the metallurgical tests of the ship's steel following the voyage 5 crack. Vallet was asked whether he or the company caused any test of the hull plate or deck plate to be made. His first answer, not responsive, was: "It was not necessary." Being pressed for a more specific answer, he said that the American Bureau of Shipping and the Coast Guard had requested a specimen of the steel removed in the way of the crack for testing purposes; that he himself never made any request for such testing. He was asked "You did not consider it was necessary to have a metallurgist look at the steel and the crack that occurred on Voyage 5?" to which he answered: "That was taken care of by the United States Coast Guard and American Bureau of Shipping," adding that they were better qualified than any other metallurgist. The witness did not know, however, whether these organizations did or did not conduct tests and he received no report of any test.
 
 
 87
 That exposes a situation to which is applicable our language in The Silver Palm, supra, where we said (94 F.2d at page 780): "In proceedings for limitation the owner may not escape liability by giving the managerial functions to an employed person acting as its agent, whether the person be corporate or otherwise." Nor can the company escape responsibility for taking due precaution reasonably required by the apparent dangers by a mere reliance upon an assumption that the Coast Guard and the American Bureau of Shipping have taken care of these matters.
 
 
 88
 In view of the court's own finding, which is not open to challenge, that the petitioner did not use due diligence as required by law to make the vessel seaworthy, what we have here said serves to disclose that that finding was abundantly supported by the evidence, and it also discloses that this lack of due diligence necessarily attached to the petitioner and not to any subordinate employees of petitioner. All this makes it unnecessary to discuss the other factors of unseaworthiness set forth in the trial court's findings.
 
 
 89
 We hold that it was error to enter a decree limiting the liability of States Steamship Company and that portion of the interlocutory decree awarding such limitation of liability is reversed and the cause is remanded to the district court for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 "A. Whenever a ship returns from a voyage, either myself or one of my assistants boards the vessel on arrival and discusses the general condition of the vessel with the Master, chief engineer, and we obtain a list of repairs which are requested by the vessel. Q. Voyage repairs, you mean? A. Voyage repairs, and examine any other damages that have occurred on the voyage."
 
 
 [2]
 It was at this time that repairs were ordered for a "fracture plate No. 3 hatch" and for "emergency steering gear." The failure of the steering systems was another factor of unseaworthiness referred to in Finding IV which need not be discussed here in view of the evidence as to the factor of crack sensitiveness, although the evidence as to the factor of unseaworthiness by reason of the faulty steering gear would show Vallet's connection with it also
 
 
 [3]
 This testimony referred to his total duties during the period just previous to the departure of the vessel, the trip No. 6, when he was acting as marine superintendent
 
 
 [4]
 This whole report which had not only been read by Vallet but which must have been required reading for all persons in the shipping industry having to do with ship maintenance, was sufficient to alert any reader to the necessity of care and caution in the handling of welded steel ships such as the Pennsylvania. It points out that welding was a relatively new process in the building of ships — a process which was still in the course of intensive study by the shipping industry generally because of the marked tendency of ships so constructed to develop fractures, to a degree unknown in respect to riveted ships. It points out that while the welding processes had great advantages with respect to speed of construction, and had served to make the wartime accelerated ship building possible, yet among the disadvantages of such construction were the bewildering phenomena with respect to fractures. In short, it would appear from a reading of this and other available studies on the subject, that a maintenance executive in the shipping industry in the exercise of due diligence should be as concerned about the problems of likelihood of fracture or of crack sensitiveness in this type of vessel as were the experts who compiled these studies
 Vallet testified that this 1946 report was followed by a second report and then by a third report by a ship structure committee convened by the Secretary of the Treasury and whose report dated November, 1953, was also an exhibit in the case below. The latter report contains descriptions and photographs of a similar crack which developed on the "Joplin Victory" at the time when the States Steamship Company was operating her. It develops at great length the proposition mentioned in the preceding report that low temperatures have an important bearing on the brittleness and tendency to fracture of steel components of these welded structures which it terms a basic concept in this field. It says under the heading of "Fundamental Investigations": "As has already been mentioned, the ability of a welded structure, such as a ship, to deform and thereby to absorb energy is considered a measure of its serviceability. The realization that, as temperature is lowered, the structure can suddenly lose ductility (at the transition temperature) becomes particularly important."
 
 
 On Petition for Rehearing on Limitation
 
 90
 PER CURIAM.
 
 
 91
 On May 31, 1957, this court handed down an opinion in this case which affirmed the decision of the trial court rejecting the claim of appellant States Steamship Company for exoneration from liability for loss resulting from the sinking of the S.S. Pennsylvania, and granting its claim for limitation of liability. Thereafter all parties filed petitions for rehearing. Upon consideration of those petitions the court withdrew its former decision of May 31, 1957, and on November 15, 1957, substituted a new opinion which upheld the appeals of the appellant insurance companies, the United States, and the Dominion of Canada, from the decree limiting liability of States Steamship Company. Thereafter States Steamship Company filed a further petition for rehearing and upon invitation of the court, the insurance companies, the United States and the Dominion of Canada filed briefs in answer thereto, to which the Steamship Company has filed a reply.
 
 
 92
 Our further study of the points raised by this petition for rehearing convinces us that whether it be our fault, or otherwise, our decision of November 15, 1957, has been misunderstood, and we now make this further effort to clarify the basis for that decision.
 
 
 93
 Our opinion stems from the findings of the district court. We take those findings and then inquire, in view of the whole record, what those findings require. They are:
 
 
 94
 1. "* * * the sole and proximate cause of the sinking of the Pennsylvania being her own unseaworthiness." (Finding III.)
 
 
 95
 2. "* * * the contributory factors responsible for the sinking of the S.S. Pennsylvania are found in the radiograms sent from the vessel immediately prior to her sinking stating that the vessel sustained a crack down the port side between frames 93 and 94; that the crack started in the sheer strake and ran down about 14 feet; that sea water entered the engine room of the vessel through this crack." (Finding IV.) (The finding also listed a failure of the steering system; the taking of water in the No. 1 hold; the coming adrift of the deck cargo; and the No. 2 hatch being open and full of water.)
 
 
 96
 3. "That the foregoing faults, failures, breakdowns and defects set forth in the preceding finding IV, together with the crack sensitiveness of the vessel to extreme cold weather * * * were factors of unseaworthiness culminating from the unseaworthy condition of the vessel at the inception of her voyage." (Finding V.)
 
 
 97
 4. The crack sensitiveness mentioned was "by reason of a former 22-foot crack in her deck occurring on her previous Voyage V, which crack was fully repaired." (Finding V.)
 
 
 98
 5. This unseaworthy condition "prevented her from meeting the expected and to be anticipated weather conditions." (Finding V.)
 
 
 99
 6. This unseaworthy condition "proximately caused her sinking with the total loss of the vessel." (Finding V.)
 
 
 100
 7. "That the evidence is insufficient to show that petitioner used the due diligence required by law to make the vessel seaworthy at the inception of her voyage, and the Court finds that the petitioner did not use the due diligence required by law to make the vessel seaworthy and to entitle it to exoneration from liability." (Finding VI.)
 
 
 101
 We accepted these findings and held that States Steamship Company had not sustained its burden of proving that it was entitled to a limitation of liability, saying:
 
 
 102
 "The reason there is no basis for the limitation here is that the only persons whose negligence could have operated to bring about the unseaworthy condition, the only persons to whom the lack of due diligence could possibly be charged, were persons who were managing officers of the corporation. The court not only did not find that the failure to exercise due diligence was that of minor or subordinate employees, but the court could not have made such a finding.
 
 
 103
 "The only persons who were on the scene and had anything to do with these factors of unseaworthiness were managerial employees."
 
 
 104
 The Steamship Company insists that we erroneously misinterpreted the trial court's findings of fact. It asserts that the court's finding VI (No. 7, above), was a finding relating to the Steamship Company's claim for exoneration; that it had no relation whatever to a question of limitation of liability or the question of privity and knowledge with which the court below dealt in its finding VII.[1]
 
 
 105
 The Steamship Company argues that in drawing our conclusions we have set forth a broad rule that in any case where the Steamship Company fails to use due diligence to make the vessel seaworthy at the inception of her voyage, limitation must be denied. We did not so hold.
 
 
 106
 There is respectable authority which would warrant the holding that where the circumstances are such that the owners or managing agents have a duty to act to see that the vessel is made seaworthy, a neglect or failure to take such action will require denial of limitation. Mere instructions to subordinate employees will not suffice to give the owner the benefit of the limitation act. Such a case was Spencer-Kellogg Co. & Sons v. Hicks, 285 U.S. 502, 510, 52 S.Ct. 450, 76 L.Ed. 903, where limitation was denied because the manager, although he had given appropriate instructions to the master, had not followed up by inquiries or personal inspection himself. The court said (285 U.S. at page 510, 52 S.Ct. at page 452): "Before allowing the ferriage operation he was under obligation to assure himself by inquiries or by personal inspection that the Linseed King should not incur the hazard of colliding, as she did, with ice floes in the river. * * * The owner was therefore chargeable with negligence in not taking measures for the safety of the passengers which the weather conditions required."[2] Mere nonaction on the part of managing agents in their allowing subordinates to prepare a ship for departure will not serve to excuse the owner from any portion of his responsibility if the knowledge of the managing agent is such that they ought to inquire and inspect. Williams S. S. Co. v. Wilbur, 9 Cir., 9 F.2d 622.[3]
 
 
 107
 There is no doubt that Vallet, the port engineer, did have a duty to make inquiries and personal inspection at the time the Pennsylvania started her voyage. But that circumstance was not alone the basis for our decision. The court's finding of lack of due diligence, it is true, refers to exoneration.[4] But it must necessarily be related to the facts of this particular case. Here one of the factors of unseaworthiness was the crack sensitiveness of the vessel and it in turn existed by reason of a former 22 foot crack in her deck. It is not material here whether the words "by reason of" were meant to say that the former crack caused the later crack, or whether the meaning is simply that her crack sensitiveness was revealed by the former 22 foot crack. In any event, and as a simple fact found by the court, the vessel was unseaworthy and was in part unseaworthy because of the crack sensitiveness.
 
 
 108
 The question next is: whose lack of due diligence sent a ship thus unseaworthy to sea? The only conclusion that any one would be entitled to draw from the evidence in this record was that Vallet was the one man so chargeable. This is not a case where it could be speculated that Vallet was off on vacation or not on duty when the failure to "use the due diligence required by law to make the vessel seaworthy", took place. Our former opinion sufficiently details what the evidence showed as to Vallet's connection with this crack problem from beginning to end and his complete knowledge of the crack sensitiveness of the vessel. It is impossible to disassociate Vallet from all of this under any possible view of the evidence. He permitted the vessel to sail on her fatal trip, and if, as the court found, there was lack of due diligence to make the vessel seaworthy in these respects, that lack of due diligence was in major part that of Vallet.
 
 
 109
 Some complaint is made that we improperly treated Mr. Brenneke as an executive officer.[5] Whether he was or not is immaterial here for in the sending forth of a ship known to have the crack sensitiveness of this one Vallet was the prime actor and for our purposes here it was immaterial whether as one who participated in that action and contributed thereto Brenneke was a managing officer or a minor employee.
 
 
 110
 It is thus apparent that the district court found there was negligence. After noting that that finding was abundantly supported by evidence, we have by our decision pointed out that upon this record such negligence was necessarily the negligence of Vallet. Accordingly we hold limitation of liability must be denied.
 
 
 111
 The burden of proof of absence of privity or knowledge is upon the shipowner. Coryell v. Phipps, 317 U.S. 406, 409, 63 S.Ct. 291, 87 L.Ed. 363. (And see cases cited in Gilmore and Black, p. 705). Our holding is, like that in Triple A Machine Shop v. Waterman Steamship Corporation, 9 Cir., 221 F.2d 916, 917, that "the shipowner did not sustain its burden of proof."
 
 
 112
 This privity or knowledge which results from Vallet's connection with the preparation of the vessel for departure results in part from the principles underlying the limitation act itself. In Spencer-Kellogg Co. v. Hicks, supra, 285 U.S. at page 511, 52 S.Ct. at page 453, the court noted the necessary distinction between the shipowner's responsibility for the neglect of sea-going employees and his responsibility in respect to his shoreside organization. Meeting an argument that in that case the fault was that of a competent master to whom instructions had been given and that the owner had done its full duty, the court said: "Cases such as La Bourgogne, 210 U.S. 95, 28 S.Ct. 664, 52 L.Ed. 973, which involved the master's failure to obey rules and instructions when on the high seas and disaster attributable to such fault, are cited. But there is a vast difference between the cases relied on and the instant one. The launch was used for ferriage over a distance of about a mile and a third. She was known to be unseaworthy and unfit if there was ice in the river. There is no analogy between such a situation and that presented in the cited cases where the emergency must be met by the master alone. In these there is no opportunity of consultation or cooperation or of bringing the proposed action of the master to the owner's knowledge. The latter must rely upon the master's obeying rules and using reasonable judgment. The conditions on the morning in question could have been ascertained by Stover, if he had used reasonable diligence, and we think the evidence is adequate to support the finding that the negligence which caused the disaster was with his, and therefore with the owner's, privity or knowledge." The reason for this "vast difference" there stated, is well described by Gilmore and Black as follows (p. 696): "The principle of the Limitation Act is the same as that found in the Harter Act and the Carriage of Goods by Sea Act: because of the extraordinary hazards of seaborne commerce and because the owner can exercise only a nominal control over his `servants' once the ship has broken ground for the voyage, the owner should be entitled to exoneration from liability, or at least to a limitation of liability, for whatever happens after the ship has passed beyond his effective control. Contrariwise, he should be held to liability for all loss resulting from his failure to exercise effective control when he had the chance.[6] Although the Limitation Act uses a vocabulary different from that of Harter and Cogsa, the concept of liability is the same: the shipowner is not chargeable with `privity or knowledge' or with `design or neglect' when he has used `due diligence' to furnish a seaworthy ship; he is so chargeable when he has failed in his duty of `due diligence' and has sent out a ship unseaworthy in some respect that proximately contributes to the loss."[7]
 
 
 113
 Petitioners make reference to the portions of the evidence in the record which they say tends to show that the steel of the Pennsylvania was no different from the steel of all welded ships built at the same time. Reference is made to technical reports and to testimony of witnesses who surveyed and inspected the ship or samples of her steel tending to show that there was no lack of due diligence in making the ship seaworthy. There is no question but that the record contains a substantial amount of evidence to that effect. The difficulty is that the trial court rejected it in the findings which we have quoted above. When the court found that the proximate cause of the sinking was the Pennsylvania's unseaworthiness; that the crack sensitiveness by reason of her former 22 foot crack in her deck was a factor of unseaworthiness culminating from her unseaworthy condition at the inception of her voyage and that there was a lack of due diligence to make the vessel seaworthy, it rejected the contrary evidence now cited to us in the Steamship Company's petition for rehearing.
 
 
 114
 It is suggested that there is something in our opinion to the effect that all welded steel vessels are unseaworthy. As authority for this assertion petitioner quotes from a television broadcast in which the broadcaster purports to construe the meaning of our decision. The broadcaster is mistaken; we did not so hold.
 
 
 115
 The petition contains a table taken from one of the exhibits in the case showing the number of fractures and casualties in some 4694 ships built by the Maritime Commission. This table shows a substantial number of fractures and casualties. On the basis of this, petitioner asserts that in respect to the likelihood of cracks and fractures, the Pennsylvania was exactly like all other welded steel ships and is no different from the bulk of dry cargo tonnage in the American Merchant Marine.
 
 
 116
 But the 127 cases of serious casualties listed in this table do not contain any Victory class vessels such as the Pennsylvania. The Pennsylvania was unique in its prior Class I hull fracture on Voyage V. The testimony showed that there had been over 2000 shipping years of experience with Victory ships and there was no history of a Class I casualty on such a ship. The failure of due diligence found by the court was in sending a ship known to be crack sensitive upon that voyage.
 
 
 117
 The suggestion that our decision puts all welded ships out of business over the northern route is wholly unwarranted.
 
 
 118
 The petition for rehearing is denied.
 
 
 119
 In this effort to clarify our decision we believe we have at least somewhat improved upon the statements made in our Nov. 15, 1957, opinion.
 
 
 
 Notes:
 
 
 [1]
 Finding VII was as follows: "That the evidence is sufficient to show that the unseaworthy condition of the vessel at the inception of her voyage was without the privity or knowledge of petitioner, and the Court finds that the unseaworthy condition of the vessel at the inception of her voyage was not with the privity and knowledge of the petitioner."
 
 
 [2]
 See Gilmore & Black, "The Law of Admiralty", 1957, p. 701: "Some duties appear to be `nondelegable', which is a way of saying that the corporation will be conclusively presumed to have `privity or knowledge' of the breach, or, more directly, that the corporation will not be entitled to limit its liability in such a case no matter what the state of proof on actual privity or knowledge
 "The nondelegable duties are all facets of what is referred to in other contexts as the shipowner's duty to provide a seaworthy ship or at least to use due diligence to do so. `Seaworthiness' is a word which in recent years has suffered from a strange expansion of meaning. Its primitive sense was no doubt what any English-speaking person, not a member of the admiralty bar, would expect it to mean today; that the ship in question must be, in the language of the customary charter-party warranty, `tight, staunch, strong and well and sufficiently tackled, appareled, furnished and equipped.' If a corporate owner fails to use due diligence to send forth his ship seaworthy in that primitive sense, and the unseaworthiness proximately causes loss or damage, the owner will be denied limitation. The corporate owner, unlike the individual owner, will not be allowed to escape liability for breach of his basic duty by delegating either to a master or to subordinate shore officials." (Emphasis added.) The authors cite as authority for this position, Grace & Co. v. Charleston Lighterage & Transfer Co., 4 Cir., 1952, 193 F.2d 539, 1952 A.M.C. 689.
 
 
 [3]
 This and other similar cases were explained by Mr. Justice Brandeis in Earle & Stoddart v. Ellerman's Wilson Line, 287 U.S. 420, 427, 53 S.Ct. 200, 201, 77 L.Ed. 403, in a footnote as follows: "In all the cases where immunity from liability for damage by fire was held to be lost because of neglect of the owners, the courts have based their finding of neglect on the action of the owners or managing agents, or upon their failure to see that action was taken where it was their duty to act."
 
 
 [4]
 We did not question that in making its finding VI, quoted above, the court below had in mind the provisions of section 3(1) of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1303(1), providing: "The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to — (a) Make the ship seaworthy", and section 4(1), 46 U.S. C.A. § 1304(1), providing that neither carrier nor ship shall be liable for loss resulting from unseaworthiness "unless caused by want of due diligence on the part of the carrier to make the ship seaworthy * * * in accordance with the provisions of paragraph (1) of section 3." Of course, in making such a finding, a court in some other case might well predicate its finding of failure to use due diligence upon evidence that the negligence or fault was that of any agent whatever, regardless of rank, provided the agency was sufficient to give rise to an application of the rule of respondent superior
 
 
 [5]
 The testimony as to Brenneke, given by Vallet, was as follows:
 "Q. During the month of December and January of 1951 and '52 would you say that Mr. Brenneke was your assistant marine superintendent? A. He was my assistant. We don't have the title of assistant marine superintendent.
 "Q. You were just marine superintendent; is that correct? A. Yes.
 "Q. But you do have the title of assistant port engineer? A. Yes.
 "Q. And Brenneke was the No. 1 man under you; is that correct? A. Yes."
 
 
 [6]
 Illustrations of this failure to exercise effective control when the owner "had the chance", are found in The Cleveco, 6 Cir., 154 F.2d 605, 613: ("* * * knowledge means not only personal cognizance but also the means of knowledge — of which the owner or his superintendent is bound to avail himself — of contemplated loss or condition likely to produce or contribute to loss, unless appropriate means are adopted to prevent it."), and in Great Atlantic & Pacific Tea Co. v. Brasileiro, 2 Cir., 159 F.2d 661, 665 ("The measure in such cases is not what the owner knows, but what he is charged with finding out.")
 
 
 [7]
 The authors add the following interesting comment: "The foregoing comment is not meant to suggest that courts customarily cross-cite Limitation Act cases and Harter Act or Cogsa cases. There is indeed authority for the proposition that the Limitation Act imposes on the shipowner a lower standard of care than do the Harter Act and Cogsa; that is, failure to have exercised `due diligence' under Harter or Cogsa does not automatically deprive the shipowner of his defense under the Fire Statute or the Limitation Act. No recent cases, however, have restated the doctrine of the lower Limitation Act standard. If the older cases are in time overruled or forgotten, in line with the discernible judicial trend to narrow the Limitation Act by construction, the situation would then be that, if the carrier is liable to cargo under the Harter or Cogsa, it would also lose its privilege under the Limitation Act. As to cargo liability, then, the Limitation Act would be in effect superseded by Harter and Cogsa, and would continue to be of importance with respect to collision, loss of life and personal injury claims."